# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| TIMMOTHY MURPHY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-CV-00131-AGF |
| | ) |
| CAROLYN COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security's finding that Plaintiff Timmothy Murphy was not disabled, and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., or supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. For the reasons set forth below, the decision of the Commissioner will be reversed and the case remanded for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

Plaintiff, who was born on November 14, 1979, filed his applications for disability insurance benefits and supplemental security income on May 25, 2011, alleging disability beginning July 1, 2009, at age 29. Plaintiff alleged disability due to a wide range of physical impairments including seizures and pain stemming from a car crash Plaintiff experienced in 2001, and psychological impairments including depression, anxiety, bipolar

disorder, and posttraumatic stress disorder. (Tr. 279-291.) After Plaintiff's application was denied at the initial administrative level, he requested a hearing before an Administrative Law Judge ("ALJ"). Such a hearing was twice postponed while Plaintiff obtained counsel, and was finally held on January 10, 2014. By decision dated January 23, 2014, the ALJ found that Plaintiff suffered from the following severe impairments: seizure disorder, degenerative disc disorder, disc bulges, history of lumbar laminectomies, anxiety, depression, posttraumatic stress disorder, bipolar disorder, and a history of polysubstance abuse. However, the ALJ also determined that Plaintiff had the residual functional capacity ("RFC") to perform certain jobs that were available in the national economy, and was thus not disabled under the Social Security Act. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 21, 2015. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action now under review. On application for judicial review, Plaintiff makes argument only with regard to his mental and psychological impairments, and alleges that the ALJ erred by failing to find his mental and psychological impairments severe and disabling.

**Medical Evidence**

Plaintiff has an extensive medical history dating back to his motor vehicle accident on July 30, 2001. (Tr. 680.) The Court will summarize Plaintiff's medical records to the extent they are relevant to his instant action for judicial review, and will focus primarily on Plaintiff's history of mental and psychological treatment.

Plaintiff initially began mental health treatment following DUI arrests in 1997 and 1998. (Tr. 683.) Plaintiff's self-reported medical history suggested he began drinking alcohol at the age of twelve and began drinking daily at the age of twenty-two. However, Plaintiff reported to a psychiatrist that he stopped drinking altogether on October 16, 2005, and he attended Alcoholics Anonymous from 2008 to 2010. Plaintiff also admitted to using heroin from the age of 22 until 2005, when he was arrested on heroin-related charges.

In 2009, Plaintiff received treatment regularly from primary care physician Dr. Kara Fess at Hygienic Institute Community Health Center ("HICHC"). Plaintiff presented to Dr. Fess on January 23, 2009, complaining of panic attacks sometimes accompanied by fainting spells. Plaintiff reported that one such panic attack was triggered by stress Plaintiff endured at work. Dr. Fess ordered a CT and other neurological exams. Plaintiff returned to the clinic in February 2009 and reported anxiety, tingling, and back pain. (Tr. 769.)

On May 29, 2009, Plaintiff began treatment at North Central Behavioral Health System for substance abuse, where he attended numerous counseling sessions and participated in group therapy, and completed 75 hours of treatment on September 25, 2009. He again presented at HICHC in September 2009 stating that he "had an anxiety attack back in [February] and now needs clearance stating he is ok to return to work." (Tr. 757.) Plaintiff also reported being "off Xanax" at that appointment, and stated that he was doing well. *Id.* He presented again in October 2009 for an updated work release, and again reported not having any problems. (Tr. 755.)

3

Thereafter, Plaintiff was sent to Continued Care, but was discharged from North Central Behavioral Health System on December 1, 2009, for failing to follow through with recommended substance abuse treatment. Although Plaintiff presented again to HICHC at various times throughout 2010 and 2011, these visits were related to physical symptoms—in several instances, stemming from physical altercations between Plaintiff and others—and Plaintiff's psychological symptoms were not significantly addressed.

Plaintiff was seen by Mark Langgut, Ph.D., for a psychological assessment on July 22, 2011. Dr. Langgut described Plaintiff as "fidgety, and initially emotionally guarded." (Tr. 681.) At the time of Dr. Langgut's evaluation, Plaintiff was taking Celexa, an antidepressant, but was not otherwise engaged in ongoing mental health treatment. He was also under a prescription for Valium and Dilantin, which were prescribed "by a neurologist in Peru [Illinois]." (Tr. 683.) Plaintiff reported to Dr. Langgut that these medications helped "reduce his depressive symptoms." *Id.* Plaintiff also reported to Dr. Langgut his significant history of substance abuse. Dr. Langgut ultimately diagnosed Plaintiff with dysthymic disorder, generalized anxiety disorder, and alcohol and heroin abuse in remission.

Plaintiff was subsequently seen by Patricia Russell, M.D., on August 6, 2011. Dr. Russell diagnosed Plaintiff with seizure disorder, anxiety, and depression. On February 15, 2013, Plaintiff was evaluated at Big Springs Medical Clinic ("Big Springs") following convulsions. The treating doctor diagnosed him with sinusitis, migraines, bipolar disorder, and depression and anxiety. (Tr. 880.) Plaintiff reported anxiety during

4

another visit to Big Springs on March 5, 2013, during which visit he reported he was unable to go to Wal-Mart because he felt like he was being stared at. He also reported a poor appetite. (Tr. 877.) Dr. Georgia Jones diagnosed bipolar disorder. (Tr. 878.)

Plaintiff saw Dr. Jones again at Big Springs on April 9, 2013, and reported an anger episode that had occurred over the weekend involving his father. Dr. Jones saw Plaintiff again on April 30, 2013, and again diagnosed bipolar disorder and noted Plaintiff's blunted expression. Dr. Jones also reported that Plaintiff was on Vicodin , Dilantin (for seizures), and Celexa at that time, and that he "push[ed] a little for [benzodiazepines] but not too hard." (Tr. 876.) Dr. Jones noted Plaintiff's depressed mood during the visit. Plaintiff was also noted to be anxious during a physical exam on September 18, 2013. (Tr. 825.)

Plaintiff was seen by Sandra Keeling, LPC, at Family Counseling Center in October 2013. (Tr. 831.) Plaintiff reported his history of posttraumatic stress disorder, bipolar disorder, and depression, and also reported severe anger outbursts, explaining that he has "harmed [people]" in the past as a result of these outbursts. *Id.*

Finally, Plaintiff was seen at C&S Family Medical by Casey Dement, a physician's assistant, on November 25, 2013. Ms. Dement—who, according to Plaintiff's hearing testimony, saw Plaintiff once a month beginning in 2013 and served as Plaintiff's primary healthcare provider, and refilled his prescriptions for Celexa, Dilantin, and Klonopin—completed a mental Medical Source Statement for Plaintiff. In it, she opined in a checkbox form that Plaintiff suffered marked limitation in six areas: ability to maintain concentration and attention for extended periods; ability to perform activities regularly and

within a schedule; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruption from psychologically-based symptoms; ability to interact appropriately with the general public; and finally, ability to travel in unfamiliar places or use public transportation. (Tr. 885-86.)

**Consultative Medical Evaluation**

Dr. Patricia Beers, Ph.D., a state agency psychological consultant, completed a Mental Residual Functional Capacity Assessment for Plaintiff on August 9, 2011. Dr. Beers' assessment contained three parts. In the first, Dr. Beers checked a variety of boxes to assess Plaintiff's mental capabilities and limitations. In this first section, Dr. Beers checked a box indicating that Plaintiff had marked limitation in his ability to interact appropriately with the general public. (Tr. 708.) She also checked boxes indicating moderate limitation in the following areas: ability to work in coordination with or proximity to others without being distracted; ability to accept instruction and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers; ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; and ability to set realistic goals and make plans independently of others. *Id.* In the remaining mental activities listed on the form, Dr. Beers assessed Plaintiff as not significantly limited. (Tr. 707-708.)

No additional comment was or given or necessarily required in the second part of the assessment form, which merely required an explanation for any category where there was insufficient information to assess Plaintiff. In the third section, Dr. Beers gave a functional capacity assessment in narrative form. Dr. Beers commented that Plaintiff suffered from dysthymia and anxiety disorder, and that his "social skills and judgment are impaired." (Tr. 709.) Although Dr. Beers opined that Plaintiff would be capable of performing work, she expressly stated in the third section that he "is best suited to a vocational setting that requires only very limited interactions with coworkers and supervisors and no interactions with the general public." *Id.*

**<u>Agency Forms</u>**

In Plaintiff's disability self-reporting forms, Plaintiff recounted taking care of his school-age daughter on a regular basis, but otherwise having little to no planned or regular activity. Plaintiff reported suffering from "high anxiety," "panic attacks," and depression. (Tr. 433.) With regard to dressing and bathing, he reported that "some days [I have] no desire to change clothes [and] don't care for a shower[.]" (Tr. 434.) He reported receiving help from his sister and mother, who assist him in bringing medications and reminding him to take them. He also reported eating infrequently, and having "no interest" in eating. (Tr. 435.) He explained that he doesn't drive, infrequently goes outside, and has difficulty with money. (Tr. 436.) He reported that he doesn't "like to be around people," and that "confrontation gives [him] anxiety." (Tr. 438.) In describing changes in social activities since the onset of his symptoms, Plaintiff described that he

"[doesn't] date, I don't go out, don't deal with people, don't want [anyone] around me." (Tr. 438.)

Plaintiff's disability file also includes a third-party report from his sister, Sirena Nive, who reported spending two to three hours each day with Plaintiff. Nive reported that Plaintiff's physical pain made it difficult for him to sleep through the night, and that he often forgot to take medications. She stated that Plaintiff performed light housework and chores, but that his pain made it difficult. She reported that he was occasionally social and visited friends, "if [he was] feeling good that day." (Tr. 402.) However, she also reported that he was prone to becoming "agitated and angry" (Tr. 403), and that he did not handle stress well. (Tr. 404.) She also explained that Plaintiff had difficulty following directions and needs frequent reminders.

**Evidentiary Hearing of January 10, 2014**

Plaintiff testified to the ALJ that that he had difficulty talking and dealing with people, reporting that he gets "really high anxiety," and is prone to "start shaking and sometimes have an anxiety attack." (Tr. 55.) He expressed that he often feels others are looking at him while in public, and must suppress urges to be physically violent toward others. (Tr. 60.) Plaintiff also testified that his seizures could be brought on by anxiety and stress. (Tr. 57.)

Also testifying at the hearing was Paul Hammond, a vocational expert ("VE"). Hammond testified that Plaintiff's past work consisted of four distinct positions: caulker, forklift operator, factory laborer, and maintenance. The ALJ then asked the VE to assume

8

a person of Plaintiff's age, education, and work experience, who is limited to lifting no more than 20 pounds occasionally and ten pounds frequently; would be able to sit, stand, or walk six hours in a work day; could not climb ropes, ladders or scaffolds; occasionally climbing ramps or stairs; would be limited to seizure precautions; and would be limited to only superficial contact with coworkers, supervisors, and the general public.[1] The VE testified that such an individual could meet the requirements of representative occupations including assembler and small products assembler. Upon questioning from Plaintiff's counsel, Hammond testified that frequent physical or verbal confrontation would preclude employment, as would missing three to four days a month of work. (Tr. 76.)

---

[1] The precise hypothetical question posed was as follows:

> Let's assume a person the same age, education, past work as you described the claimant. Let's further assume this person would be limited to lifting no more than 10 pounds occasionally. Excuse me, 20 pounds occasionally, 10 pounds frequently. Would be able to sit, stand, or walk six hours in an eight hour day. Would not—no ladders, ropes or scaffolding. Occasional be able to walk on—climb stairs, ramps, stoop, kneel, balance, crouch, crawl. Further assume this person would be limited to seizure precautions. No working around dangerous heights or dangerous machinery. No working around open bodies of water. No working in confined spaces. No working around large open vessels or vats. Further, let's assume this person would be limited to only superficial contact with co-workers, supervisors and the general public. By superficial I would mean no negotiation, arbitration, mediation, confrontation, or supervision[.] [W]ould that person be able to return to the past work of the claimant? . . . Would there be any other jobs in the national or regional economy such a person could perform?

(Tr. 74.)

**ALJ's Decision of January 23, 2014**

The ALJ found that Plaintiff suffered from the severe impairments of seizure disorder, degenerative disc disorder, disc bulges, history of lumbar laminectomies, anxiety, depression, posttraumatic stress disorder, bipolar disorder, and a history of polysubstance abuse. However, the ALJ determined that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Specifically with regard to Plaintiff's mental impairments, the ALJ determined that the "Paragraph B" criteria were not satisfied because Plaintiff suffered only mild restriction in activities of daily living, moderate difficulties in social functioning, mild difficulties with regard to concentration, persistence, and pace, and had not experienced an episode of decompensation of any extended duration. (Tr. 15-16.) In making this determination, the ALJ noted Plaintiff's sister's report that he took care of his daughter and occasionally performed chores around the home, and that he socialized every few days. (Tr. 15.)

The ALJ assigned little weight to the opinions proffered by Casey Dement, finding she was not an acceptable medical source. The ALJ further expressed that Ms. Dement's findings were "not supported by the laboratory findings [or] diagnostic evidence," and noted that her course of treatment had been short. (Tr. 21.) The ALJ gave "some weight" to the opinions of the state agency consultants, including the psychiatric review and Mental Residual Functional Capacity Assessment completed by Dr. Patricia Beers. However, in his decision, the ALJ did not give a detailed analysis of Dr. Beers' opinions,

10

nor did he express which of the limitations in those opinions he considered entitled to weight.

The ALJ determined that Plaintiff could not perform past relevant work, but retained the RFC to perform light work with some additional limitations, including superficial interaction with the public, coworkers, or supervisors. Based on the vocational expert's testimony that a hypothetical individual with Plaintiff's limitations would be able to perform the requirements of representative occupations including assembler and small products assembler, the ALJ determined that Plaintiff was not under a disability. The ALJ found that the vocational expert's testimony was consistent with the information contained in the DOT, and was in accordance with the vocational expert's training and experience.

**Arguments of the Parties**

On application for judicial review, Plaintiff makes just one argument. Plaintiff argues that the ALJ's assigned RFC is improper because it is not supported by substantial evidence, as required by SSR 96-8p. Specifically, Plaintiff points out that the ALJ "accepted" and gave "some weight" to reviewing psychologist Dr. Beers' opinion in determining that Plaintiff retained the RFC to perform a limited range of light work. However, Dr. Beers' opinion included that Plaintiff had marked limitation in his ability to interact appropriately with the general public (Tr. 708), and that Plaintiff suffered from moderate limitations in his ability to work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers, maintain socially

appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (Tr. 707-708.)

Plaintiff argues that, while the ALJ could properly choose to accept only some of the limitations proffered by Dr. Beers, he was required to set forth and explain why some of Dr. Beers' limitations were not adopted since he expressly accepted and gave weight to her opinion as a whole. Plaintiff points out that the only mental limitation the ALJ included in Plaintiff's RFC was that Plaintiff could only interact superficially with coworkers and supervisors; but none of Dr. Beers' additional mental limitations, including dysthymia, anxiety, and impaired judgment, were mentioned or addressed, and moreover, Dr. Beers' specific limitation that Plaintiff could not interact with the public was wholly disregarded.

In response, Defendant argues that because Dr. Beers completed her opinion on a Mental Residual Functional Capacity Assessment ("MRFCA") form, and because most of the limitations mentioned by Plaintiff were documented in the first section, "Summary Conclusions," and not in the third section that constitutes the physician's opinion in narrative form, the ALJ did not err by failing to include those limitations in his RFC or give reasons for not including them. Defendant also argues that even if the limitations proffered by Plaintiff were in fact part of Dr. Beers' opinions, they were properly excluded because the ALJ afforded Dr. Beers' opinion only "some weight." Finally, Defendant argues that Dr. Beers' opinion was inconsistent with the record to the extent it required the limitations suggested by Plaintiff.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'" *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). The court "'may not reverse . . . merely because substantial evidence would support a contrary outcome. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a severe impairment or combination of impairments, defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."

13

*Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix I. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1).

If the claimant can perform his past work, the claimant is not disabled. If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors—age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

**<u>Weight Afforded to Dr. Beers' Opinion</u>**

When determining a plaintiff's RFC, an ALJ must consider "all relevant evidence," but ultimately, the determination of the plaintiff's RFC is a medical question. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. *Id.*; *see also Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). When determining the RFC, "'[t]he opinion of a consulting physician who examines a claimant once or not at all does not

14

generally constitute substantial evidence.'" *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)).

However, this Court has previously held that where an ALJ does assign weight to a consultative physician's opinion, or otherwise finds it persuasive, he must give an explanation if he then disregards the opinion in formulating a plaintiff's RFC. *Reynolds v. Astrue*, No. 1:06 CV 64 CDP DDN, 2007 WL 5100461, at *3 (E.D. Mo. Aug. 7, 2007). In *Reynolds*, a non-examining consultative physician opined that the plaintiff had mental limitations of depression and anxiety. The ALJ stated that he found the non-examining consultative physician's opinion "well rationalized," and did not explain whether or in what respects he found it not credible. When the ALJ chose not to adopt the physician's opinions regarding the claimant's limitations, the Court reversed and remanded, explaining that "[w]hile the ALJ is not required to give great weight to a consulting physician's opinion, here, the ALJ stated that he found [the] opinion 'well rationalized,' and did not explain why he found it not credible." *Reynolds*, 2007 WL 5100461 at *4. The Eighth Circuit has similarly held that while the opinion of a non-examining consultative physician may be disregarded, the ALJ must at least explain the decision to disregard such an opinion. *See McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008) ("Our primary difficulty is not with the possibility that the ALJ discounted [the consultative physician's] opinion, as an ALJ is free to discount a physician's report if the record warrants this . . . . The problem with the ALJ's opinion is that it is unclear whether the ALJ *did* discount [the] opinion, and, if it did so, why.").

15

In the instant matter, the ALJ found that the state agency consultants, including Dr. Beers, "provided specific reasons for their opinions . . . showing that these opinions were grounded in the evidence of record, including careful consideration of the objective medical evidence[.]" (Tr. 21.) The ALJ then "accepted" these opinions, and assigned Dr. Beers' opinion "some weight." *Id.* The ALJ appeared to incorporate Dr. Beers' assessment of Plaintiff's moderate limitations—generally speaking, his limitations in getting along and working with others—by assigning an RFC wherein Plaintiff is capable only of superficial interaction with the public, coworkers, or supervisors.

However, the ALJ did not incorporate into Plaintiff's RFC Dr. Beers' opinion that Plaintiff should have no interactions with the general public. In fact, Dr. Beers specifically opined that Plaintiff "is best suited to a vocational setting that requires only very limited interactions with coworkers and supervisors and no interactions with the general public." (Tr. 709.) Neither did the ALJ account for Dr. Beers' articulated opinions regarding Plaintiff's dysthymia, anxiety disorder, and impaired judgment in Plaintiff's RFC. In fact, the ALJ specifically found that "medical records show limitations in judgment and social skills," but in Plaintiff's assigned RFC and in the hypothetical question posed to the vocational expert at Plaintiff's hearing, the only identified mental limitation was the aforementioned "superficial interaction with the public, coworkers, or supervisors." [2] (Tr. 16.) Thus, the ALJ rejected several important

---

[2] Indeed, in the hypothetical posed to the VE, the ALJ appeared to further narrow the scope of the restriction by explaining that "superficial interaction" meant "no negotiation,

parts of Dr. Beers' opinion. The Court agrees that based on the ALJ's initial assignment of weight to Dr. Beers' opinion, and his finding that the opinion was well-supported by the record, the ALJ erred by failing to give reasons for partially rejecting Dr. Beers' opinion.

Even if the Court accepts Defendant's argument that the "Summary Conclusions" section of the form does not constitute a medical opinion, Dr. Beers' written opinion in the third section is a medical opinion that the ALJ disregarded in determining Plaintiff's RFC. It was in this third, narratively-structured section that Dr. Beers espoused an opinion regarding Plaintiff's dysthymia, anxiety disorder, and impaired judgment. The Court similarly rejects Defendant's argument that because the ALJ used the phrase "some weight," he was not required to explain and give reasons for his failure to assign an RFC that accords with the opinion. The ALJ's statement that Dr. Beers' opinion is "grounded in the evidence of record," and his confirmation that he "accepted" the opinion, in turn requires that he give reasons for disregarding important parts of it when assigning Plaintiff's RFC; he is not relieved of this obligation simply by using the mitigating phrase "some weight." Just as in *McCadney*, 519 F.3d at 767, and *Reynolds*, 2007 WL 5100461 at \*4, the ALJ's failure to explain his decision to disregard the consultative opinion was error.

**Dr. Beers' Limitations May Be Supported by the Record**

The ALJ's decision to disregard Dr. Beers' opinions could be overlooked if those opinions were not supported by the record. *See McCadney*, 519 F.3d at 767. However,

---

arbitration, mediation, confrontation or supervision." (Tr. 74.)

that is not the case here. As noted above, the ALJ in the instant matter expressly found that Dr. Beers "provided specific reasons for [her] opinions . . . showing that these opinions were grounded in the evidence of record, including careful consideration of the objective medical evidence" (Tr. 21), and yet nonetheless disregarded Dr. Beers' opinion with regard to Plaintiff's ability to handle interactions with the public in formulating his RFC. And Dr. Beers' opinion in this regard finds support in the record, as the ALJ initially noted.

Defendant cites a number of instances in Plaintiff's medical records where his demeanor was described as attentive, cooperative, and appropriate, or where he was otherwise assessed to have an unremarkable affect. *See, e.g.*, Tr. 976-1012, 630-642. But Plaintiff's medical history also indicates that he has repeatedly and consistently been diagnosed with depression, anxiety, posttraumatic stress disorder, and dysthymia by a number of health care providers. *See, e.g.*, Tr. 681-683, 831, 876-78, 885-86. The record also indicates—by way of self-reporting, medical diagnosis, and circumstantial evidence, given Plaintiff's frequent injuries resulting from physical altercations—that Plaintiff's psychological limitations manifest in aggression, which would support a finding that Plaintiff's impairments limit him from a job requiring interaction with the general public, and may otherwise affect his ability to work. Despite taking medication and otherwise addressing his psychological impairments on a somewhat consistent basis, Plaintiff has continued to suffer symptoms. (Tr. 683.) Plaintiff reported to a medical provider that could not go to Wal-Mart because he felt he was being stared at, and he experienced urges to act out in violence toward others (Tr. 877). He reported altercations with both strangers

and family members resulting from anger. *See, e.g.*, Tr. 876. His agency forms suggest he cries or yells at family members "for no reason," and that such actions "don't feel like me sometimes." (Tr. 439.) Plaintiff's sister and the physician's assistant also corroborated Plaintiff's mental health limitations.

In short, there appears to be ample evidence in the record supporting Dr. Beers' opinion that Plaintiff suffers from significant mental impairments—which the ALJ presumably recognized in initially assigning Dr. Beers' opinion weight. Therefore, the ALJ should have explained—and should explain on remand—why he ultimately disregarded significant portions of Dr. Beers' opinion in formulating Plaintiff's RFC.

## **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED**.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated on this 5th day of August, 2016.